UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/18/2025
```

------------------------------------------------------------------X
:
BIRDIE GIRL GOLF, LLC,                                            :
:
                              Plaintiff,                          :        24-cv-9425 (LJL)
:
                  -v-                                             :        OPINION AND ORDER
:
MANY HATS ENTERPRISES, LLC,                                       :
:
                              Defendant.                          :
:
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Many Hats Enterprises, LLC ("Defendant") moves, pursuant to Federal Rules

of Civil Procedure 12(b)(2), 12(b)(5), and 12(b)(6), to dismiss the Complaint for lack of personal

jurisdiction, insufficient service of process, and failure to state a claim.  *See* Dkt. No. 11.

## BACKGROUND

The Court first describes the allegations in the Complaint, which it accepts as true for

purposes of the motion to dismiss for failure to state a claim.  It then describes the evidence

submitted by the parties on the motions to dismiss for lack of service and lack of personal

jurisdiction.

### A.    Allegations in the Complaint

Plaintiff Birdie Girl Golf, LLC ("Plaintiff") is a corporation formed under the laws of

Idaho and maintains its principal place of business in Boise, Idaho.  Dkt. No. 1 ¶ 1.  Plaintiff is

known for its golf equipment, apparel, and other golf-related goods including but not limited to

golf-ball markers, jewelry, clothing, headwear, and golf-related services.  *Id.*  Since at least May

5, 2021, Plaintiff has continuously advertised, marketed, promoted, sold, and offered for sale its

golf-related goods and services to consumers throughout the United States and elsewhere under the trade name and house mark BIRDIE GIRL, with and without various design elements. *Id.* Plaintiff has primarily advertised, marketed, promoted, sold, and offered for sale its goods and services through its ecommerce website "www.birdiegirlgolf.com" ("Plaintiff's Website"). *Id.*

Plaintiff owns two valid and subsisting U.S. federal trademark registrations on the principal register (collectively, "the Birdie Girl Marks"): (1) U.S. Trademark Registration No. 7,395,251 for the mark BIRDIE GIRL, which was registered on May 28, 2024, for "golf ball markers" in International Class 28, and "online retail store services featuring jewelry, golf ball markers, clothing, headwear, and a variety of other golf and sporting accessors" in International Class 35, and which was filed on August 31, 2022, and claimed a date of first use in the United States of April 16, 2022; and (2) U.S. Trademark Registration No. 7,395,252 for the mark birdiegirl, which was registered on May 28, 2024, for "golf ball markers" in International Class 28, and "online retail store services featuring jewelry, golf ball markers, clothing, headwear, and a variety of other golf and sporting accessors" in International Class 35, and which was filed on August 31, 2022, and claimed a date of first use in the United States of April 16, 2022. *Id.* ¶ 10; Dkt. Nos. 1-1, 1-2.

Defendant is a limited liability company existing under the laws of Minnesota and maintains its principal place of business in Pequot Lakes, Minnesota. Dkt. No. 1 ¶ 2. It designs and sells golf bags and provides other golf-related goods and apparel through its online retail store at "www.birdiebabegolf.com" ("Defendant's Website"). *Id.* Defendant owns one active U.S. federal trademark registration on the principal register (the "Birdie Babe Mark"): U.S. Trademark Registration No. 4,931,336 for the mark birdiebabe, which was registered on April 5, 2016, filed on June 18, 2015, and claimed a date of first use in United States of June 30, 2011.

*Id.* ¶ 16; Dkt. No. 1-7.  The Birdie Babe Mark covers "[o]n-line retail store services featuring golf items, namely, golf bags, golf club head covers, golf push carts, golf gloves, golf towels, golf travel bags, golf shirts, golf hats, golf visors, water bottles, [and] insulated containers for beverage cans for domestic use" in International Class 35.  Dkt. No. 1 ¶ 16.  Defendant owns one active and pending U.S. federal trademark application on the principal register ("the Birdie Babe Application"): U.S. Trademark Serial No. 98/368,055 for the mark BIRDIE BABE, for "[o]n-line retail store services featuring golf items, namely, golf bags, golf club head covers, golf push carts, golf gloves, golf towels, golf travel bags, golf shirts, golf hats, golf visors, water bottles, [and] insulated containers for beverage cans for domestic use."  *Id.* ¶ 17; Dkt. No. 1-8.  The Birdie Babe Application was filed on January 21, 2024, and claimed a date of first use of June 30, 2011.  Dkt. No. 1 ¶ 17.  Defendant previously applied to register, and later abandoned on May 4, 2015, a U.S. federal trademark application on the principal register: U.S. Trademark Serial No. 85/302,933 for the mark BIRDIE BABE, for "golf club bags; golf clubs" in International Class 28.  *Id.* ¶ 24.

Defendant registered the domain for its website, "www.birdiebabegolf.com," on February 16, 2011.  *Id.* ¶ 18.  In late 2023 or early 2024, however, Defendant acquired the domain name registrations for "birdiegirl.com" and "birdiegirlgolf.net" (the "Birdie Girl Domains").  *Id.* ¶ 19.  On or about February 21, 2024, Defendant arranged for each of the Birdie Girl Domains to automatically redirect to Defendant's Website when typed into an internet browser.  *Id.* ¶ 20.  As a result, consumers who have entered the Birdie Girl Domains, including ones in New York, have been redirected to Defendant's Website.  *Id.* ¶ 8.

Plaintiff sent an email to Defendant on October 28, 2024, informing Defendant of the Birdie Girl Marks and requesting that Defendant stop using the Birdie Girl Domains to direct

internet traffic to Defendant's Website.  *Id.* ¶ 21; Dkt. No. 1-14.  Defendant responded later that day informing Plaintiff that Defendant was aware of Plaintiff's existence and that Defendant had elected not to take action against Plaintiff's use and registration of the Birdie Girl Marks because Defendant "didn't want to be a jerk" and was "busy with life and had better things to worry about."  Dkt. No. 1 ¶ 22; Dkt. No. 1-15.

On November 1, 2024, Defendant's attorney sent an email to Plaintiff stating that Defendant was not interested in discontinuing use of the Birdie Girl Domains or transferring them to Plaintiff.  Dkt. No. 1 ¶ 23; Dkt. No. 1-16 at 1.  The email further stated that Plaintiff's registration and use of the Birdie Girl Marks for golf goods and services infringe on Defendant's Birdie Babe Mark.  Dkt. No. 1 ¶ 23; Dkt. No. 1-16 at 1.  Defendant's attorney asked that Plaintiff: (1) immediately surrender the Birdie Girl Marks for cancelation in their entireties; and (2) present to Defendant within thirty days a plan to rebrand and discontinue use of the Birdie Girl Marks within a reasonable timeframe of not more than six months.  Dkt. No. 1 ¶ 23; Dkt. No. 1-16 at 1.

Plaintiff filed this suit on December 10, 2024, asserting two claims: (1) for damages (including treble damages) and declaratory and injunctive relief under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d); and (2) for a declaratory judgment that it has not infringed and is not infringing Defendant's rights in the Birdie Babe Mark.  Dkt. No. 1 ¶¶ 39–51.

In the Complaint, Plaintiff alleges, on information and belief, that Defendant has acted in bad faith in connection with the registration and use of the Birdie Girl Domains and that Defendant's actions have caused serious and irreparable injury in the form of loss of competitive advantage, loss of business reputation and goodwill, and loss of sales and profits.  *Id.* ¶¶ 15, 31,

37–38.  Plaintiff further claims, also on information and belief, that before Defendant obtained

the Birdie Girl Domains, it had actual and constructive knowledge of Plaintiff's use and

ownership of the Birdie Girl Marks because Plaintiff filed trademark applications for the marks

with the U.S. Patent & Trademark Office on August 31, 2022.  *Id.* ¶ 32.  Moreover, when

Plaintiff informed Defendant of the Birdie Girl Marks and requested that Defendant cease

operating the Birdie Girl Domains, Defendant responded that it was aware of Plaintiff's

existence.  *Id.* ¶ 22.  The Complaint further contends that Defendant has profited from the

redirection of web traffic intended for the Birdie Girl Domains, and that Defendant's use of the

Birdie Girl Domains is likely to cause consumers mistakenly to believe that Defendant's goods

and services are sponsored or approved by Plaintiff or are otherwise affiliated with or offered

under the Birdie Girl Marks with Plaintiff's permission.  *Id.* ¶¶ 30, 42.

### B.    Evidence Regarding Service

The day after Plaintiff initiated this suit, counsel for Defendant sent an email to counsel

for Plaintiff stating: "We're happy to waive service of a summons.  Just send me the form, etc."

Dkt. No. 14-3.  Later that same day, counsel for Plaintiff sent an email to counsel for Defendant

stating in pertinent part:

> We appreciate your offer to waive service of the Complaint, and we are seeking
> our client's instructions regarding same.  We will otherwise withhold serving the
> Complaint until at least February 8, 2025 to provide Many Hats Enterprises, LLC
> with an opportunity to resolve this matter without the need for litigation by
> confirming that: (1) your client will take no action against our client's U.S.
> trademark registration numbers: 7,395,251 and 7,395,252 (collectively, the
> "Birdie Girl Registrations") or its use of the corresponding marks; and (2) your
> client will reconsider its position regarding the Birdie Girl Domains.  In the
> meantime, Birdie Girl Golf, LLC reserves all rights.
>
> In the event you share Birdie Girl's desire to amicably resolve this matter, please
> contact us.  We look forward to your response.

Dkt. No. 14-4.  There is no evidence of a response.

5

On December 17, 2024, Plaintiff served the summons and Complaint on Defendant by personal service on Defendant's owner in Minnesota.  Dkt. No. 8.

###    C.    Evidence Regarding Personal Jurisdiction

Plaintiff and Defendant have both submitted declarations with respect to personal jurisdiction.  Dkt. Nos. 13–14, 17–18.  The Court assumes the truth of the averments except as otherwise stated.

Plaintiff avers through its owner that it is a well-established company known for its golf equipment, apparel, and other golf-related goods including but not limited to golf-ball markers, jewelry, clothing, headwear, and golf-related services.  Dkt. No. 18 ¶ 2.  Since at least as early as May 5, 2021, it has continuously advertised, marketed, sold, and offered for sale its golf equipment, apparel, and golf-related goods and services by its ecommerce website at "www.birdiegirlgolf.com" to consumers throughout the United States and elsewhere, including in New York, under the trade name and house mark BIRDIE GIRL.  *Id.* ¶ 3.  Plaintiff offers evidence that it has sold golf-related goods in New York and marketed them specifically toward consumers in New York, including through advertising on the platforms Google Ads, Meta, and Instagram.  *Id.* ¶ 5.  Plaintiff has also sponsored golf-related events in the New York area.  *Id.* ¶¶ 10–11.  Plaintiff has targeted the New York market due to a significant increase in female golf participation in the state in recent years.  *Id.* ¶¶ 12–13.  Plaintiff avers that Defendant's operation of the Birdie Girl Domains has caused injury to Plaintiff both within and beyond New York.  *Id.* ¶¶ 16–17.

Plaintiff's supporting declarations also make certain assertions regarding Defendant's business.  Plaintiff states that in addition to advertising products on its own website, Defendant operates on Walmart, eBay, and Amazon's websites and makes its products available for purchase and shipment to customers in New York, as well as throughout the United States.  *Id.* ¶

15.  It appears that Defendant at one point also offered international shipping.  Dkt. No. 17-2 ¶ 3.  Defendant has been featured in media publications, some with national readerships.  *Id.* ¶¶ 4–5.

Defendant avers through its owner that it is a Minnesota limited liability company with a principal place of business in Pequot Lakes, Minnesota, and maintains the online retail store at "birdiebabegolf.com."  Dkt. No. 13 ¶¶ 2-3.  It is owned by a husband and wife team both of whom reside in Minnesota.  *Id.* ¶ 1.  It acquired the domain name "birdiegirlgolf.net" and registered it with GoDaddy in Arizona in June 2022 and began redirecting the web traffic to Defendant's Website.  *Id.* ¶ 4.  In December 2023, Defendant acquired the domain name "birdiegirl.com" and registered it with GoDaddy in Arizona and began redirecting the web address to Defendant's Website.  *Id.* ¶ 5.  The owners aver that it would be an extreme burden for them to litigate in New York and that the documents they have related to the case are located in Minnesota, not New York.  *Id.* ¶ 8.

## PROCEDURAL HISTORY

As previously noted, the Complaint in this action was filed on December 10, 2024.  Dkt. No. 1.  Defendant filed this motion to dismiss on January 3, 2025.  Dkt. No. 11.  Defendant also filed a memorandum of law and two declarations in support of the motion.  Dkt. Nos. 12–14.  Plaintiff filed a memorandum of law in opposition to the motion on January 17, 2025, along with the declaration of Lindzee Barrera.  Dkt. Nos. 17–18.  Defendant filed a reply memorandum of law in further support of the motion on January 23, 2025.  Dkt. No. 19.  After an initial pretrial conference held on March 26, 2025, the parties filed supplemental letter briefs addressing personal jurisdiction.  Dkt. Nos. 25–26.

## LEGAL STANDARDS

Defendant moves to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(2), 12(b)(5), and 12(b)(6).  Dkt. No. 11.

A motion under Rule 12(b)(2) challenges the Court's personal jurisdiction over the moving party.  "When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."  *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'"  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  "Where, as here, jurisdictional discovery has not been conducted, the plaintiff need only make a prima facie showing by his pleadings and affidavits that jurisdiction is proper."  *Id.* at 85; *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).  "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits."  *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012).  "If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."  *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) (citation omitted).  The court must "construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in [its] favor."  *V&A Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 131 (2d Cir. 2022) (quoting *DiStefano*, 286 F.3d at 84).

The prima facie showing required to establish personal jurisdiction prior to an evidentiary hearing "must include an averment of facts that, if credited by the trier, would suffice to establish

jurisdiction over the defendant." *Dorchester Fin. Sec.*, 722 F.3d at 85.  While the Court

"construe[s] the pleadings and affidavits in the light most favorable to plaintiffs," *id.*, the Court

"will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a

legal conclusion couched as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2001*, 714

F.3d 659, 673 (2d Cir. 2013) (citations omitted).  "[C]onclusory allegations are not enough to

establish personal jurisdiction." *Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 625 (S.D.N.Y.

2003) (quoting *Marczeski v. Kamba*, 2001 WL 237204, at *1 (D. Conn. Feb. 23, 2021)), *aff'd*,

355 F.3d 206 (2d Cir. 2004); *accord Creative Photographers, Inc. v. Grupo Televisa, S.A.B.*, 763

F. Supp. 3d 618, 632–33 (S.D.N.Y. 2025); *Megna v. Biocomp Labs. Inc.*, 166 F. Supp. 3d 493,

496–97 (S.D.N.Y. 2016).

A motion under Rule 12(b)(5) challenges the sufficiency of service of process.  "When a

defendant moves to dismiss a complaint under Rule 12(b)(5), the plaintiff bears the burden of

proving adequate service." *Esposito v. TipRanks, Ltd.*, 2024 WL 68528, at *2 (S.D.N.Y. Jan. 4,

2024) (quoting *Militinska-Lake v. Kirnon*, 2023 WL 7648511, at *1 (2d Cir. Nov. 15, 2023)

(summary order)); *see* 4A Wright & Miller's Federal Practice and Procedure § 1083 (4th ed.

2025) ("[T]he party on whose behalf service of process is made has the burden of establishing its

validity.").  "In deciding a Rule 12(b)(5) motion, a Court must look to Rule 4, which governs the

content, issuance, and service of a summons." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d

54, 64 (S.D.N.Y. 2010).

On a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief

can be granted, the court must accept as true all factual allegations in the complaint and draw all

possible inferences from those allegations in favor of the plaintiff.  *See York v. Ass'n of the Bar*

*of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir.), *cert. denied*, 537 U.S. 1089 (2002).  This

requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.* A complaint must offer more than "labels and conclusions," or

"a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of

"further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555, 557 (2007). The ultimate question is whether a "claim has facial plausibility,"

which is established where "the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a

reasonable expectation that discovery will reveal evidence" supporting the claim. *Twombly*, 550

U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46–47 (2011).

## DISCUSSION

### I.    Personal Jurisdiction

"To determine personal jurisdiction over a non-domiciliary in a case involving a federal

question, the Court must engage in a two-step analysis." *Chloe v. Queen Bee of Beverly Hills*,

LLC, 616 F.3d 158, 163 (2d Cir. 2010). First, the court considers whether there is a basis for

personal jurisdiction under the laws of the forum state. *Id.*; *see also D.H. Blair & Co., Inc. v.

Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006). Second, the court examines whether the exercise of

personal jurisdiction comports with constitutional due process. *See Chloe*, 616 F.3d at 164; *see

also Licci ex rel Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2014).[1]

---

[1] The Lanham Act does not provide for nationwide service of process. *See Bailon v. Pollen
Presents*, 2023 WL 5956141, at *5 n.2 (S.D.N.Y. Sept. 13, 2023). Other federal statutes do, *see,*

### A.    State Law

New York law provides "two ways to establish personal jurisdiction over a defendant: (1) 'general jurisdiction' under N.Y. C.P.L.R. § 301; and (2) 'specific jurisdiction' under N.Y. C.P.L.R. § 302." *Kreit v. Byblos Bank S.A.L.*, 2023 WL 6977448, at *4 (S.D.N.Y. Oct. 22, 2023), *aff'd*, 2025 WL 338194 (2d Cir. Jan. 30, 2025) (summary order).

General jurisdiction exists under C.P.L.R. 301 if the defendant is domiciled in New York or has "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990) (quoting *McGowan v. Smith*, 419 N.E.2d 321, 323 (N.Y. 1981)).  Numerous courts have acknowledged, however, that New York's "'doing business' test for general jurisdiction was effectively abolished" by the Supreme Court's decision in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), such that general jurisdiction under New York law now largely tracks the "essentially at home" test used in federal jurisprudence. *Owens v. Ronemus*, 2024 WL 3105605, at *5 n.4 (S.D.N.Y. June 24, 2024) (citation omitted); *see also Gucci Am., Inc v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014); *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 n.2 (2d Cir. 2014).

Specific jurisdiction exists under C.P.L.R. 302(a) over any non-domiciliary who in person or through an agent:

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or . . .
>
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

---

*e.g.*, 15 U.S.C. § 22, and the resulting analysis is different, *see* Fed. R. Civ. P. 4(k)(1)(C).  The analysis would also be different if Defendant were not subject to jurisdiction in any state's courts of general jurisdiction.  *See* Fed. R. Civ. P. 4(k)(2); *Multi Access Ltd. Guangzhou Baiyunshan Pharm. Holdings Co., Ltd.*, 2024 WL 3498180, at *6–7 (S.D.N.Y. July 22, 2024).

> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; . . .

N.Y. C.P.L.R. 302(a).  Although the Complaint alleges that Defendant has "systematic and continuous business contacts . . . within New York," Dkt. No. 1 ¶ 8—i.e., the standard for general jurisdiction under C.P.L.R. 301—it offers no specifics to support that conclusory assertion, and Plaintiff has not otherwise argued that Defendant is subject to general jurisdiction in New York.  Plaintiff instead argues principally that specific personal jurisdiction exists under either C.P.L.R. 302(a)(1) or (a)(3)(ii).  *See* Dkt. No. 17 at 2–6; Dkt. No. 25 at 1–2.  The Court addresses each in turn. [2]

### 1.    C.P.L.R. 302(a)(1)

"To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006).  Transacting business under C.P.L.R. 302(a)(1) requires "purposeful activity"—that is, "volitional acts" through which a defendant "avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Al Rushaid v. Pictet & Cie*, 28 N.E.3d 1, 7 (N.Y. 2016) (citation

---

[2] "A plaintiff must establish [personal] jurisdiction with respect to each claim asserted." *79th Grp., Inc. v. Moore*, 2024 WL 36992, at *12 (S.D.N.Y. Jan. 3, 2024) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).  The personal-jurisdiction analysis here for Plaintiff's two claims is largely overlapping, as the parties acknowledge.  *See* Dkt. Nos. 25–26. In any event, Defendant has asserted that if the Court finds personal jurisdiction over one claim, Defendant consents to personal jurisdiction over the remaining claim.  *See* Dkt. No. 26.

omitted).  The Second Circuit has held that "Section 302 is a single act statute" such that "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Chloe*, 616 F.3d at 170. Thus, in *American Girl, LLC v. Zembrka*, the Circuit held that personal jurisdiction existed even where no products had been shipped into New York, as the defendant "accepted orders with New York shipping addresses, sent confirmatory emails with New York shipping addresses containing commitments to ship to those New York addresses, and accepted payments from a customer with a New York address."  118 F.4th 271, 277 (2d Cir. 2024).

At the same time, "[m]erely offering a product outside New York for sale in New York is not enough to constitute purposeful availment when no sale actually takes place in New York or to a New York resident."  *Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 364 (S.D.N.Y. 2020); *see also Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, 2018 WL 2022626, at *4 (S.D.N.Y. Apr. 30, 2018) ("Even the existence of an interactive 'patently commercial' website that can be accessed by New York residents is not sufficient to justify the exercise of personal jurisdiction unless some degree of commercial activity occurred in New York." (quoting *ISI Brands, Inc. v. KCC Int'l, Inc.*, 458 F. Supp. 2d 81, 87–88 (E.D.N.Y. 2006)).  Indeed, it "stretches the meaning of 'transacting business' to subject defendants to personal jurisdiction in any state merely for operating a website, however commercial in nature, that is capable of reaching customers in that state, without some evidence or allegation that commercial activity in that state actually occurred."  *Savage Universal Corp. v. Grazier Const., Inc.*, 2004 WL 1824102, at *9 (S.D.N.Y. Aug. 13, 2004) (Lynch, J.).  *But see WowWee Grp. Ltd. v. Meirly*, 2019 WL 1375470, at *4 (S.D.N.Y. Mar. 27, 2019) (Nathan, J.) (holding at the default judgment stage that where a

defendant's "alleged conduct and failure to appear serve to limit Plaintiffs' ability to show that such commercial transactions occurred, the Court finds such showing unnecessary").

At the threshold, Plaintiff has failed sufficiently to allege that Defendant "transacted business" within New York under C.P.L.R. 302(a)(1). The Complaint's discussion of personal jurisdiction amounts to the following:

> This Court has personal jurisdiction over Defendant because Defendant has availed itself of the rights and benefits of the laws of the State of New York, has conducted business under and enforced its rights under the BIRDIE BABE mark in New York, and has systematic and continuous business contacts within this Judicial District and within New York. On information and belief, Defendant sells, advertises, markets, and promotes and has sold, advertised, marketed and promoted its golf-related goods via an ecommerce store that is accessed by users, including users in New York who have entered the desired Internet address as birdiegirl.com or birdiegirlgolf.net and arrived after being redirected to Defendant's website at birdiebabegolf.com, which is available and accessible in New York. Defendant's use of the terms BIRDIE GIRL and BIRDIE GIRL GOLF in Defendant's domain names without Plaintiff's authorization to use its registered and common law trademarks has caused and continues to cause injury to Plaintiff within and beyond the State of New York. Defendant's acts form a substantial part of the events or omissions giving rise to Plaintiff's claims.

Dkt. No. 1 ¶ 8. Although the Complaint alleges that Defendant operates an interactive commercial website that is "available and accessible in New York," *id.*, it notably fails to allege that Defendant has ever sold any products in New York or otherwise entered into agreements in the state. Aside from the assertion that Defendant "has conducted business under and enforced its rights under the BIRDIE BABE mark in New York"—a conclusory statement that the Court need not accept as true, *see Creative Photographers*, 763 F. Supp. 3d at 632—Plaintiff alleges at most that Defendant has "offer[ed] a product outside New York for sale in New York," *Spin Master*, 463 F. Supp. 3d at 364. That is not enough to establish personal jurisdiction under C.P.L.R. 302(a)(1). *Id.* Section 302 may require proof of only "one transaction in New York," *Am. Girl*, 118 F.4th at 276, but not even that much has been alleged here.

14

Nor do the Complaint or supporting documents elsewhere sufficiently allege that Defendant transacted business in New York. Although these documents discuss Plaintiff's own business in New York in detail, *see, e.g.*, Dkt. No. 23 ¶¶ 5–13; *id.* Exs. 1–6, they lack any information or allegations regarding Defendant's business in the state. Plaintiff observes, for example, that Defendant's products are available for shipping around the country—and potentially even internationally, Dkt. No. 17 at 5—and that Defendant has at various points appeared in national media publications, *id.*, but those assertions shed no light on Defendant's contacts in New York specifically. To find that Defendant has "transacted business" in New York under these circumstances would be to authorize personal jurisdiction even absent evidence or allegation that Defendant has "avail[ed] itself of the privilege of conducting activities within [New York]." *Al Rushaid*, 28 N.E.3d at 7. On this record, personal jurisdiction under C.P.L.R. 302(a)(1) is therefore improper.

### 2.    C.P.L.R. 302(a)(3)(ii)

Plaintiff has likewise failed to establish personal jurisdiction under C.P.L.R. 302(a)(3)(ii). That subsection of the long-arm statute requires a plaintiff to allege that "(1) the defendant committed a tortious act outside New York; (2) the cause of action arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 946 N.E.2d 159, 162 (N.Y. 2011).

Establishing the first two requirements here is straightforward enough. "Trademark infringement can be a 'tort' for [the] purpose of determining long-arm jurisdiction." *Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 470–71 (S.D.N.Y. 2008) (Chin, J.)

(quoting *PDK Labs, Inc. v. Proactive Labs, Inc.*, 325 F. Supp. 2d 176, 180 (E.D.N.Y.2004)).

Plaintiff alleges a species of trademark infringement and asserts that the infringing conduct,

which occurred outside the state, has "resulted in harm to Plaintiff's property rights in the

BIRDIE GIRL Trademarks through harm to Plaintiff's reputation and goodwill, [and has]

resulted in lost income, and . . . caused economic injury to Plaintiff." Dkt. No. 1 ¶ 46. The cause

of action, moreover, arises directly from that alleged tort.[3]

As for the third requirement—that the tortious act caused injury to a person or property in

New York—in "traditional commercial tort cases the plaintiff's injury is deemed to take place

where its business is lost or threatened." *Spin Master*, 463 F. Supp. at 366 (cleaned up) (quoting

*Penguin Grp.*, 946 N.E.2d at 164). The in-state injury requirement has therefore "long been

interpreted to include 'harm to a business in the New York market through lost sales or lost

customers.'" *Energy Brands*, 571 F. Supp. 2d at 467 (quoting *Am. Network, Inc. v. Access

Am./Connect Atlanta, Inc.*, 975 F. Supp. 494, 497 (S.D.N.Y. 1997)); *see also Creative

Photographers*, 763 F. Supp. 3d at 638 (recognizing that an in-state injury can exist "in the form

of the loss of New York customers"); *Darby Trading Inc. v. Shell Trading & Shipping Co. Ltd.*,

568 F. Supp. 2d 329, 336 (S.D.N.Y. 2008) ("While Plaintiff is correct to note that lost sales or

customers can satisfy the 'injury within New York' requirement under Section 302(a)(3)(ii),

those lost sales must be in the New York market, and those lost customers must be New York

customers."). In trademark cases in particular, courts have found that "the injury requirement is

---

[3] Conflating the personal-jurisdiction analysis with its failure-to-state-a-claim arguments,
Defendant contends that because Plaintiff has insufficiently pleaded its anti-cybersquatting
claim, it has therefore also failed to establish a "tort" under C.P.L.R. 302(a)(3)(ii). Dkt. No. 19
at 5. A plaintiff "'need not actually prove that defendant committed a tort' to satisfy the first
element of § 302(a)(3)(ii), 'but rather need only state a colorable cause of action.'" *Gucci Am.,
Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 241 (S.D.N.Y. 2010) (citation omitted).
For the reasons explained below, *see infra* Section III, Plaintiff has done so here.

satisfied by harm and threatened harm resulting from actual or potential confusion and deception of internet users in New York State." *Id.*; *see also Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 568 (S.D.N.Y. 2000) ("[The in-state injury rule] is satisfied by Citigroup's claim that its actual and potential customers in New York are confused or deceived when they view and interact with the City National web sites."); *Am. Network*, 975 F. Supp. at 497.

Although Plaintiff has not alleged that Defendant's redirection of web traffic resulted in Defendant transacting business with New York consumers, *see supra* Section IA.1, Plaintiff has alleged that Defendant's actions resulted in Plaintiff losing New York sales and consumers.  That suffices to establish the in-state injury requirement.  *See Energy Brands*, 571 F. Supp. 2d at 467. The Complaint asserts that consumers—and specifically ones in New York—have attempted to access Plaintiff's Website but have instead been redirected to Defendant's, *see* Dkt. No. 1 ¶ 8, and it further alleges that this redirection has resulted in harm to Plaintiff's business reputation and goodwill and lost sales and profits, *id.* ¶¶ 38, 46.  Together, and construing the pleadings in the light most favorable to Plaintiff, these assertions add up to the allegation that Plaintiff's business has been "lost or threatened" in New York as a result of Defendant's conduct.  Indeed, Plaintiff has alleged not only that potential customers in New York were unlawfully redirected from its website, but also that the New York market represents an important part of its business. Plaintiff has demonstrated sustained advertising efforts targeting New York consumers from at least April 2022.  Dkt. No. 23 ¶¶ 8–10.  New York sales make up a significant portion of its gross sales.  *Id.* ¶¶ 6–7.  And it has sponsored events in the state "due to a significant increase in female golf participation in New York."  *Id.*  ¶¶ 10–12.  These facts support the conclusion that the alleged harm caused by Defendant has been felt specifically in New York.

Plaintiff is unable, however, to make out a similar showing on the fourth and fifth prongs of C.P.L.R. 302(a)(3)(ii).  The fourth prong requires that the "defendant expected or should reasonably have expected the act to have consequences in New York." *Penguin Grp.*, 946 N.E.2d at 162.  The "simple likelihood or foreseeability" of consequences within the state is insufficient.  *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d Cir. 1999); *see also Spin Master*, 463 F. Supp. 3d at 366.  Rather, "foreseeability must be coupled with evidence of a purposeful New York affiliation, for example, a discernible effort to directly or indirectly serve the New York market." *Energy Brands*, 571 F. Supp. 2d at 468 (quotation omitted); *Parker Waichman Alonso LLP v. Orlando Firm, P.C.*, 2010 WL 1956871, at *10 (S.D.N.Y. May 14, 2010).  "New York courts thus look for tangible manifestations of a defendant's intent to target New York, or for concrete facts known to the nondomiciliary that should have alerted it to the possibility of being brought before a court in the Southern District of New York." *Richtone Design Grp., LLC v. Live Art, Inc.*, 2013 WL 5904975, at *5 (S.D.N.Y. Nov. 4, 2013).  As explained above, Plaintiff has not alleged that Defendant "made sales to New York or otherwise targeted New York, such as through active advertising or marketing efforts." *Spin Master*, 463 F. Supp. 3d at 366.  Plaintiff has therefore failed to allege that Defendant purposefully availed itself of the benefits of New York's laws such that it could have reasonably anticipated being haled into a New York court.  The fourth prong of 302(a)(3)(ii) is thus lacking for much the same reason that 302(a)(1) is.

Additionally, the Complaint contains insufficient allegations regarding Defendant's revenue from interstate or international commerce and therefore also fails at the fifth prong. New York courts have explained that the substantial-revenue requirement is "designed to narrow 'the long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might

cause direct, foreseeable injury within the State but 'whose business operations are of a local

character.'" *LaMarca v. Pak-Mor Manufacturing Co.*, 735 N.E.2d 883, 886 (N.Y. 2000).  Some

courts have described this prong as "a 'bigness requirement' designed to ensure that the

defendant is 'economically big enough to defend suit in New York.'"  *Glenn H. Curtiss Museum

of Local History v. Confederate Motors, Inc.*, 2021 WL 514229, at *6 (W.D.N.Y. Feb. 11, 2021)

(citation omitted).  Consistent with this understanding, the New York Court of Appeals has

found no personal jurisdiction exists over a physician who practiced only in Vermont and earned

his entire revenue from his local medical services, *see Ingraham v. Carroll*, 687 N.E.2d 1293,

1296 (N.Y. 1997), while it has exercised jurisdiction over a Texas corporation that had a Virginia

manufacturing facility, a New York distributor and representative, and which derived substantial

revenue from national advertising and New York sales, *see LaMarca*, 735 N.E.2d at 889–90.

Although "the burden on Plaintiff is very low at this stage," *Richtone*, 2013 WL 5904975,

at *8, Plaintiff has alleged no facts regarding Defendant's interstate or international revenue.

Instead, Plaintiff has alleged simply that Defendant makes its products available for shipment

across the country (and in the past, internationally), and that Defendant has appeared in a handful

of media publications, some with national readerships.  *See* Dkt. No. 17-2.  These facts fall short

of establishing that Defendant's business has taken on a national or international character such

that it "can fairly be expected to defend lawsuits in foreign forums."  *Energy Brands*, 571 F.

Supp. 2d at 468.

Having found personal jurisdiction lacking under New York's long-arm statute, the Court

declines to proceed to a constitutional due-process analysis.

### 3.    Jurisdictional Discovery Is Appropriate.

Plaintiff contends that to the extent it has failed to establish personal jurisdiction over

Defendant, the Court should order limited jurisdictional discovery rather than dismissing the case.  Dkt. No. 17 at 7–8.  Defendant responds that jurisdictional discovery should be denied because Plaintiff has failed to make out a prima facie case for jurisdiction.  Dkt. No. 12 at 12. The Court agrees with Plaintiff that jurisdictional discovery is appropriate and therefore declines to dismiss the case on personal-jurisdiction grounds.

A district court has "wide latitude to determine the scope of discovery," including jurisdictional discovery.  *See Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016) (internal quotation marks omitted).  "[E]ven if a plaintiff has not made a prima facie showing [of jurisdiction], a court may nevertheless order discovery 'when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record.'"  *Regenlab USA LLC v. Estar Techs. Ltd.*, 2017 WL 3601304, at *4 (S.D.N.Y. Aug. 17, 2017) (quoting *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194-95 (E.D.N.Y. 2014)).  Discovery is typically warranted where the Plaintiff can make out a "colorable claim of jurisdiction."  *Id.* That is especially true when "the facts necessary to establish personal jurisdiction . . . lie exclusively within the defendant's knowledge."  *Cicalo v. Harrah's Operating Co., Inc.*, 2008 WL 1847665, at *6 (S.D.N.Y. Apr. 24, 2008); *Energy Brands*, 571 F. Supp. 2d at 468 (noting that "dismissal for lack of personal jurisdiction is inappropriate under 302(a)(3)(ii) even where there is no proof that a defendant derives substantial revenue from interstate or international commerce, where that knowledge is peculiarly under the control of the defendant, and may come to light in the course of subsequent discovery" (internal quotation marks and alterations omitted)).

That describes this case.  Although Plaintiff has so far been unable to establish personal jurisdiction, it has made out a "colorable claim of jurisdiction." *Regenlab USA*, 2017 WL

3601304, at *4.  Plaintiff has pointed to Defendant's interactive commercial website, which is available in New York, Defendant's apparent willingness to ship products throughout the United States, and Defendant's appearance in national media publications.  What is more, it appears that Plaintiff has been unable to establish personal jurisdiction over Defendant at least in part because relevant facts—particularly Defendant's business contacts and relationships in New York, its potential targeting of the state through advertising and marketing, and its revenues from interstate or international commerce—"lie exclusively within the defendant's knowledge."  *Id.* Plaintiff should therefore be afforded an opportunity to develop those facts through limited jurisdictional discovery.

## II.    Service of Process

Defendant next argues that the Court should dismiss the action under Federal Rule of Civil Procedure 12(b)(5) because Plaintiff served Defendant with the summons and Complaint on December 17, 2024, contrary to what Defendant claims was an agreement between the parties that Defendant would not be served before February 8, 2025.  Dkt. No. 12 at 2-3.  As evidence of this purported agreement, Defendant cites two emails.  In the first, Defendant's counsel writes to Plaintiff's counsel that Defendant will waive service.  Dkt. No. 14-3.  In the second, Plaintiff's counsel responds by stating, in relevant part:

> We appreciate your offer to waive service of the Complaint, and we are seeking our client's instructions regarding same.  We will otherwise withhold serving the Complaint until at least February 8, 2025 to provide Many Hats Enterprises, LLC with an opportunity to resolve this matter without the need for litigation by confirming that: (1) your client will take no action against our client's U.S. trademark registration numbers: 7,395,251 and 7,395,252 (collectively, the "Birdie Girl Registrations") or its use of the corresponding marks; and (2) your client will reconsider its position regarding the Birdie Girl Domains.  In the meantime, Birdie Girl Golf, LLC reserves all rights.

> In the event you share Birdie Girl's desire to amicably resolve this matter, please contact us.  We look forward to your response.

21

Dkt. No. 14-4.  There is no evidence of a response from Defendant.

In order to survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(5), a plaintiff must show that it made service consistent with Federal Rule of Civil Procedure 4.  *See Paul v. Capra*, 2022 WL 992845, at *3 (S.D.N.Y. Mar. 31, 2022); *Hahn v. Off. of Pro. Emps. Int'l Union, AFL-CIO*, 107 F. Supp. 3d 379, 382 (S.D.N.Y. 2015).  There is no dispute that Plaintiff did so here.  Plaintiff has filed proof of personal service on Defendant's owner in Minnesota.  Dkt. No. 8.  That method of service is sufficient under Rule 4.  *See* Fed. R. Civ. P 4(h)(1)(B) (authorizing service on domestic corporations "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process"); 4A Wright & Miller's Federal Practice and Procedure § 1103 (4th ed. 2025) (a managing or general agent is one "in a position of sufficient responsibility so that it is reasonable to assume that the person will transmit notice of the commencement of the action to organizational superiors").

Defendant cites a handful of cases for the proposition that parties can contractually agree to a method of service of process that deviates from Rule 4.  Dkt. No. 12 at 2–3; *see H.V. Indus., Inc. v. Fall Safe On Line-Comercio de Produtos de Proteccao Pessoal Lda. of Porrtugal*, 2017 WL 10222370, at *4 (M.D. N.C. Aug. 11, 2017); *Russell Brands, LLC v. GVD Int'l Trading, SA*, 282 F.R.D. 21, 24 (D. Mass. 2012); *see also Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964).  None of these cases, however, involved a situation where, as here, proper notice was provided under Rule 4, and the defendant nonetheless argued that Rule 4 notice violated the terms of an agreement.  Nor in resolving these cases did the courts rely on the agreements or grant the defendants' motions to dismiss.

Regardless of the extent to which parties may contract for alternative service, Defendant

recognizes that, at the very least, there must be a binding agreement between the parties, *see* Dkt. No. 12 at 2–3, and Defendant has failed to establish any such agreement. It is "axiomatic that the formation of a contract requires offer and acceptance." *Muratovic v. Market Sols. Grp., Inc.*, 2023 WL 2683044, at *4 (E.D.N.Y. Mar. 29, 2023); *accord Assure Glob., LLC v. Anderson*, 763 F. Supp. 3d 476, 484 (S.D.N.Y. 2025). Defendant has shown nothing on the facts of this case other than that it extended an offer which Plaintiff did not accept. In response to Defendant's offer to waive service, Plaintiff's counsel replied simply that they would "seek[] our client's instructions." Dkt. No. 14-4. That does not constitute an acceptance. In fact, Plaintiff's counsel added that they would temporarily withhold service to allow Defendant to reconsider its position, which further suggests that Plaintiff was not accepting Defendant's offer—as the offer would have waived service altogether.

Plaintiff's promise to temporarily withhold service likewise cannot be viewed as the relevant offer which then formed the basis for a binding contract. For one, the promise was unsupported by consideration. "Consideration is defined as either a bargained for gain or advantage to the promisee or a bargained for legal detriment or disadvantage to the promisor." *Annabi v. N.Y.U.*, 2023 WL 6393422, at *6 (S.D.N.Y. Sept. 29, 2023) (quoting *Startech, Inc. v. VSA Arts*, 126 F. Supp. 2d 234, 236 (S.D.N.Y. 2000)). For consideration to be "bargained for," "the promisor must seek [consideration] in exchange for his promise, and the promisee must give it in exchange for that promise." *Pennolino v. Cent. Prods. LLC*, 2023 WL 3383034, at *15 (S.D.N.Y. May 11, 2023). Plaintiff sought and received nothing from Defendant in exchange for its offer to temporarily withhold service. Tellingly, Defendant argues that the parties' purported agreement required Plaintiff to withhold effecting service for a certain period of time, but Defendant never states what reciprocal legal detriment or disadvantage was required of it. *See*

Dkt. No. 12 at 3; Dkt. No. 19 at 2 (asserting that Defendant "performed under the agreement" but never stating what that performance entailed).  To be sure, in making its promise, Plaintiff undoubtedly hoped that Defendant would reconsider its stance regarding the domain names.  But Plaintiff's offer was not contingent on that outcome—instead, it was made in order to facilitate it.  Plaintiff's promise was therefore gratuitous and not binding.[4]

Even assuming, however, that there was some offer supported by consideration, it again appears there was no acceptance, as Defendant neither replied to the email nor accepted by performance (e.g., by transferring the domain names to Plaintiff).  As Defendant has failed to establish any binding agreement regarding service of process, its motion to dismiss the Complaint under Rule 12(b)(5) is denied.

## III.    Failure to State a Claim for Relief

Finally, Defendant moves to dismiss Count One of the Complaint on the grounds that Plaintiff's anti-cybersquatting allegations fail to state a claim for relief.  Dkt. No. 12 at 12–14.  Defendant argues that the Complaint's allegations of bad faith are conclusory and that the Complaint does not allege that Defendant is the registrant of the Birdie Girl Domains or an authorized licensee of such registrant.  *Id.*

The Anti-Cybersquatting Consumer Protection Act ("ACPA") provides in pertinent part:

A person shall be liable in a civil action by the owner of a mark, including a
personal name which is protected as a mark under this section, if, without regard

---

[4] To the extent Defendant suggests that it provided consideration in the form of an offer to waive service, that argument runs into a number of problems.  Defendant had already offered to waive service when Plaintiff made its promise, so Plaintiff's promise cannot be said to have "induced" Defendant's promise.  *See* Restatement (Second) of Contracts § 71 (A.L.I. 1981) ("[I]t is not enough that the promise induces the conduct of the promisee or that the conduct of the promisee induces the making of the promise; both elements must be present, or there is no bargain.").  Perhaps even more fundamentally, it makes no sense to say that in exchange for Plaintiff's promise to temporarily withhold service, Plaintiff sought Defendant's reciprocal promise to waive service.  Why would Plaintiff agree to refrain from doing something (serving Defendant) in exchange for Defendant's promise that Plaintiff would not have to do that very thing?

to the goods or services of the parties, that person—

> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
> (ii) registers, traffics in, or uses a domain name that—
>
> > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; . . .

15 U.S.C. § 1125(d)(1)(A).  To prevail on a claim under the ACPA, a plaintiff must demonstrate that "(1) its trademark is either distinctive or famous, (2) the domain name is identical or confusingly similar to the trademark, and (3) the defendant acted with a bad-faith intent to profit from the trademark."  *Mattel, Inc. v. www.fisher-price.online*, 2022 WL 2801022, at *6 (S.D.N.Y. July 18, 2022) (citing *Webadviso v. Bank of Am. Corp.*, 448 F. App'x 95, 97 (2d Cir. 2011) (summary order)); *accord Experience Hendrix, L.L.C. v. Pitsicalis*, 2020 WL 3564485, at *4 (S.D.N.Y. July 1, 2020).

In determining whether a person has a bad faith intent to profit, the statute further provides that a court:

> may consider factors such as, but not limited to—
>
> > (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
> >
> > (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> >
> > (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> >
> > (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
> >
> > (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion

as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B).

"Courts have struggled to define the boundaries of 'bad faith intent to profit' because the ACPA expressly allows consideration of factors beyond the nine enumerated indicia." *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 432 (S.D.N.Y. 2013).  Indeed, in line with the statute's permissive "may consider" language, the Second Circuit has directly held that courts "are not limited to considering just the listed factors when making [a] determination of whether" the bad-faith requirement has been met.  *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 498 (2d Cir. 2000); *see also Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir. 2001) ("We need not . . . march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive.").  Courts instead take "a more case-specific approach to bad faith," considering "a defendant's whole course of conduct, including conduct during ACPA litigation."  *Gioconda*, 941 F. Supp. at 433.

26

Over the years, courts have ascertained two "quintessential examples" of bad faith "closest to the ACPA's heartland." *Amplify Car Wash Advisors LLC v. Car Wash Advisory LLC*, 770 F. Supp. 3d 625, 642 (S.D.N.Y. 2025). The first is "where a defendant purchases a domain name very similar to the trademark and then offers to sell the domain to the trademark owner at an exorbitant price." *Id.* The second—and more relevant for present purposes—is "where a defendant 'intends to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's." *Id.* (quoting *Gioconda*, 941 F. Supp. at 433); *accord Kelly Toys Holdings, LLC v. Guangzhou Lianqi Tech. Co.*, 2024 WL 1360919, at *6 (S.D.N.Y. Apr. 1, 2024), *report and recommendation adopted*, 2024 WL 1908435 (S.D.N.Y. May 1, 2024); *see also Webadviso*, 448 F. App'x at 98 (defendant "ran afoul of the ACPA" because regardless of "whether or not he had any intention of selling the domain names to [the plaintiff], he clearly had the intention to profit from the goodwill associated with the trademarks that comprised the domain names[, and his] business model relied upon diverting internet users . . . to his own website"); *Target Advert., Inc. v. Miller*, 2002 WL 999280, at *10 (S.D.N.Y. May 15, 2002) ("[I]t would be logically inconsistent for the [ACPA] to prohibit the unlawful registration or use of a domain name in order to profit through its sale, but permit the unlawful registration and use of a domain name in order to profit through its use.").

Defendant asserts that the Complaint's bad-faith allegations are conclusory and otherwise deficient for various reasons. First, seizing on one of the statutory bad-faith factors, Defendant argues that the Complaint has failed to allege likely confusion between Defendant's Website and the Birdie Girl Marks. Dkt. No. 12 at 13–14; Dkt. No. 19 at 2–4; *see* 15 U.S.C. § 1125(d)(1)(B)(V) (listing as one example of bad faith a defendant's "intent to divert consumers

from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, *by creating a likelihood of confusion* as to the source, sponsorship, affiliation, or endorsement of the site" (emphasis added)).  Not so.  The Complaint specifically states that "Defendant's use of the Birdie Girl Domains to redirect Internet traffic to Defendant's Website is likely to cause consumers mistakenly to believe that Defendant's goods and services are sponsored or approved by Plaintiff or are otherwise affiliated with or offered under the BIRDIE GIRL Trademarks with the permission of Plaintiff."  Dkt. No. 1 ¶ 42.  Contrary to Defendant's suggestion, then, Plaintiff has alleged potential harm to the goodwill associated with its marks through a likelihood of confusion.  *Compare* Dkt. No. 12 at 13–14; Dkt. No. 19 at 2–4, *with* Dkt. No. 1 ¶¶ 15, 37–38, 42, 46.  That allegation, moreover, is not merely conclusory given that the marks are wholly, or nearly wholly, subsumed within the domains ("birdiegirl.com" and "birdiegirlgolf.net").  *See Amplify Car Wash*, 770 F. Supp. 3d at 640 (holding as a matter of law that marks were "confusingly similar" to domain names where the marks were "wholly contained in the domain along with language identifying the type of business").

To the extent Defendant argues that Plaintiff has failed precisely to meet the requirements of the fifth statutory bad-faith factor, *see* Dkt. No. 12 at 13–14; Dkt. No. 19 at 2–4, it is well-established that "strict adherence to the statutory indicia" is not required, *see Amplify Car Wash*, 770 F. Supp. 3d at 642; *see also Sporty's Farm*, 202 F.3d at 498.  Furthermore, courts have identified as one of two "heartland" bad-faith examples a situation closely mapping onto the allegations in the Complaint—i.e., one where a defendant "intends to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark

owner's." *Gioconda*, 941 F. Supp. 2d at 434 (citation omitted); *see also Amplify Car Wash*, 770 F. Supp. 3d at 642 ("Although the plaintiff does not allege that this redirect was an attempt to 'harm the goodwill represented by the mark' . . . courts may look beyond the factors identified in ACPA and where a defendant intends to profit by diverting customers from the trademark owner's site to the defendant's site, 'the case for bad faith is at its peak.'" (citation omitted)). The Complaint states that Defendant, which generally sells the same types of products as Plaintiff (golf-related goods and apparel marketed to women), Dkt. No. 1 ¶¶ 1–2, 18; Dkt. Nos. 1-12, 1-15, 1-18, obtained the disputed domain names containing Plaintiff's protected mark, Dkt. No. 1 ¶ 19, in order to redirect consumers from Plaintiff's Website to Defendant's own, *id.* ¶¶ 8, 20, 30, 42, so that Defendant could thereby profit from the redirected web traffic, *id.* ¶¶ 30, 41, 38.  Thus, rather than alleging "simple redirection," *see* Dkt. No. 12 at 13, Plaintiff has alleged one of the "quintessential examples" of bad faith, *see Gioconda*, 941 F. Supp. 2d at 434.

Additional factors support the conclusion that Plaintiff has sufficiently pleaded bad faith. In assessing bad faith, courts, including the Second Circuit, have considered a defendant's prior knowledge of a plaintiff's marks before registering the contested domain names.  *See, e.g.*, *Sporty's Farm*, 202 F.3d at 499; *see also* 15 U.S.C. § 1125(d)(1)(B)(VIII) (listing as one of the statutory bad-faith factors "the person's registration or acquisition of multiple domain names *which the person knows* are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names" (emphasis added)).  The Complaint alleges that Defendant had both actual and constructive knowledge of the Birdie Girl Marks prior to acquiring the Birdie Girl Domains.  Dkt. No. 1 ¶¶ 32, 37, 51.  Specifically, the Complaint alleges that in 2011, Defendant submitted a federal trademark application for the mark "Birdie Babe," which was refused during prosecution because of possible confusion with former "Birdie Girl"

registrations.  *Id.* ¶¶ 24–25.  Plaintiff also filed its application for the Birdie Girl Marks approximately a year and a half before Defendant acquired the Birdie Girl Domains and filed its most recent application for the Birdie Babe Mark.  *Id.* ¶ 32.  And in response to Plaintiff's email requesting that Defendant stop using the Birdie Girl Domains, Defendant's owner expressly confirmed that she "was aware of" Plaintiff.  *Id.* ¶¶ 21–22; Dkt. No. 1-15.

As explained above, the Complaint further asserts that Defendant's motivation was a commercial one, so the fourth statutory bad-faith factor also cuts in Plaintiff's favor.  *See* 15 U.S.C. § 1125(d)(1)(B)(IV) (listing as one of the statutory bad-faith factors "the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name").  So, too, does the second factor, which asks "the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person."  *Id.* § 1125(d)(1)(B)(II).  Defendant's mark appears only partly in the contested domains, while Plaintiff's marks appear entirely in the domains.  Together, these allegations are more than sufficient to establish bad faith.

Defendant raises one final argument why Plaintiff has failed to state a claim.  Defendant contends that although Plaintiff has alleged Defendant's "use" of the Birdie Girl Domains, the ACPA specifies that a "person shall be liable for using a domain name . . . only if that person is the domain name registrant or that registrant's authorized licensee," 15 U.S.C. § 1125(d)(1)(D), and Plaintiff has not alleged that Defendant so qualifies.  Defendant's argument is meritless.  "A domain name 'registrant' is the person or entity that owns a particular domain name."  *Meta Platforms, Inc., v. New Ventures Servs. Corp.*, 2023 WL 5651994, at *1 (M.D. Pa. Aug. 31, 2023); *accord GoPets Ltd. v. Hise*, 657 F.3d 1024, 1030 (9th Cir. 2011); *Jysk Bed'n Linen v. Dutta-Roy*, 810 F.3d 767, 775 (11th Cir. 2015).  The Complaint repeatedly alleges Defendant's

acquisition, registration, and ownership of the domains.  *See, e.g.*, Dkt. No. 1 ¶¶ 4, 19, 41.[5]  The

Complaint therefore states a claim for relief under the ACPA.

## CONCLUSION

Defendant's motion to dismiss for improper service and failure to state a claim under

Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6) is denied.  Plaintiff has failed to establish

personal jurisdiction over Defendant, but the Court will grant limited jurisdictional discovery

related to that issue consistent with this opinion.

SO ORDERED.

Dated: August 18, 2025
      New York, New York

                                    LEWIS J. LIMAN
                                    United States District Judge

---

[5] In addition, Defendant has conceded acquiring the Birdie Girl Domains in supporting declarations.  *See* Dkt. No. 13 ¶¶ 4–5.